STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-CIV-2021-00058

NECEC TRANSMISSION, LLC, et al., )
)
)
Plaintiffs & Intervenors, )
)
v. )
)
BUREAU OF PARKS AND )
LANDS, et al. )
)
Defendants & Intervenors. )

ORDER DENYING PLAINTIFFS'
MOTION FOR
RECONSIDERATION

In the wake of the Law Court's decision in this case, *NECEC Transmission LLC, et al. v. Bureau of Parks and Lands, et al.*, 2022 ME 48, 281 A.3d 618, Plaintiffs (along with Intervenors aligned with Plaintiffs) have asked the Court to reconsider its Order Denying Plaintiffs' Motion for Preliminary Injunction. *See* M.R. Civ. P. 7(b)(5). The Court heard oral argument on October 19, 2022. Plaintiffs argue that the Law Court has essentially decided the case, and thus this Court should vacate its prior Order. For the reasons discussed below, the Court disagrees with Plaintiffs' analysis.

Contrary to Plaintiffs' arguments, the Law Court did not determine that Plaintiffs have vested rights to complete construction of the New England Clean Energy Connect project (the Project); did not determine it is likely that Plaintiffs will succeed on the merits; and did not otherwise telegraph that Plaintiffs will prevail. Instead, the Law Court clarified its vested rights jurisprudence, announced a new

1

legal standard for determining the existence of vested rights, and returned the case to this Court for factfinding: "To be clear, we do not decide whether NECEC performed substantial construction in good faith according to a schedule that was not created or expedited for the purpose of generating a vested rights claim." *NECEC Transmission*, 2022 ME 48, ¶ 51, 281 A.3d 681.

Plaintiffs nevertheless focus on the next sentence in the Law Court's decision: "Although it appears from the limited record developed in connection with the request for preliminary injunctive relief that NECEC did so, it is up to the trial court to make those factual determinations on remand." *Id.* Rather than advance Plaintiffs' argument, however, the quoted language highlights the absence of a vested rights determination by the Law Court and the need for factfinding.

The Law Court declined to find (or reject) vested rights due to what it characterized as the limited record developed in connection with the request for preliminary injunctive relief. That same limited record is what is before this Court. In that regard, it is worth noting that the record is limited in two ways. First, the record was developed before the new legal standard was articulated by the Law Court, and thus the record does not allow resolution of the question now presented. Second, the record consists only of affidavits and attachments. All parties waived their right to an evidentiary hearing on the motion for preliminary injunction. As a consequence, there has not yet been any testimony in this case, and Defendants have not had any opportunity to probe whether Plaintiffs' construction schedule was created or expedited for the purpose of generating a vested rights claim.

Since the Law Court did not determine whether Plaintiffs have vested rights to complete construction of the Project, there is no reason for this Court to reconsider its analysis of the other three preliminary injunction considerations. Although Plaintiffs have warned about an approaching tipping point, after which completion of the Project will no longer be feasible, Plaintiffs have not argued the tipping point will occur while this case is being litigated in the trial court. This matter is currently on a fast track for trial in April 2023 and a prompt trial court decision thereafter. At that point Plaintiffs will either prevail, and be able to resume construction on the Project, or not. If not, Plaintiffs can appeal and seek an injunction from the Law Court. *See* M.R. Civ. P. 62(g) ("The provisions in this rule do not limit any power of the Superior Court or Law Court during the pendency of an appeal to suspend, modify, restore, or grant an injunction or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered."). It follows, therefore, that Plaintiffs will not suffer any irreparable injury while this matter proceeds to factfinding and resolution in the trial court.

For all of these reasons, Plaintiffs' request for reconsideration is denied.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Dated: __10/21/2022__  _____

Michael A. Duddy
Judge, Business and Consumer Court

Entered on the docket: 10/21/2022

3

NECEC TRANSMISSION, LLC, et al.

    *Plaintiff(s),*

*v.*

BUREAU OF PARKS & LANDS, et al.

    *Defendant(s).*

Party Name:

*Avangrid Networks, Inc.*
*NECEC Transmission, LLC*

Bureau of Parks & Lands,
Maine Dept of Agriculture,
Conservation & Forestry
Maine House of Representatives
Maine Public Utilities Commission
Maine Senate

_____

Intervenors

Cianbro Corporation

Attorney Name:

John Aromando, Esq.
Jared Desrosiers, Esq.
Joshua Dunlap, Esq.
Sara Murphy, Esq.
    254 Commercial Street
    Portland, ME 04101

Jonathan Bolton, Esq.
    111 Sewall Street
    6 State House Station
    Augusta, ME 04333

Phillip Coffin, Esq.
Cyrus Cheslak, Esq.
Jeffrey Russell, Esq.
    PO Box 15215
    Two Monument Square
    Suite 400
    Portland, ME 041

H.Q. Energy Services, (U.S.) Inc.

Timothy Woodcock, Esq.
Andrew Hamilton, Esq.
Casey Olesen, Esq.
Jonathan Andreau Pottle
    80 Exchange Street
    PO Box 1210
    Bangor, ME 04402

Industrial Energy Consumer Group

Sigmund Schutz, Esq.
    One City Center
    PO Box9546
    Portland, ME 04112

Int'l Brotherhood of Electrical Workers Local 104

Benjamin Grant, Esq.
    4 Union Park
    PO Box 5000
    Topsham, ME 04086

Maine State Chamber of Commerce

Gerald Petruccelli, Esq.
    2 Monument Square, Ste 900
    PO Box 17555
    Portland, ME 04112

NextEra Energy Resources, LLC

Christopher Roach, Esq.
    527 Ocean Ave, Unit 1
    Portland, ME 04103

Natural Resources Council of Maine
Thomas B. Saviello
Theresa E. York
Robert C. York
Wendy A. Huish
Jonathan T. Hull
Christine M. Geisser

James Kilbreth, Esq.
David Kallin, Esq.
Jeana M. Mccormick, Esq.
Oliver Walton, Esq.
    84 Marginal Way,
    Suite 600
    Portland, ME 04101

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-CIV-2021-00058

NECEC TRANSMISSION LLC, et al., )
)
)
Plaintiffs & Intervenors, )
)
v. )
)
BUREAU OF PARKS AND LANDS, et al., )
)
)
Defendants & Intervenors. )

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On November 3, 2021, Plaintiffs filed a three count Verified Complaint for Declaratory Judgment. The Verified Complaint seeks to permanently block retroactive application of the recently enacted ballot initiative which imposes a geographic ban on the construction of High Impact Transmission Lines in Maine and imposes new requirements on parties seeking to lease Public Lands. On the same date, Plaintiffs also filed a Motion for Preliminary Injunction (the "Motion"), seeking to enjoin the Initiative while this litigation is pending. The Motion has been fully briefed by Plaintiffs, Defendants, and the many Intervenors. Oral argument on the Motion was held on December 15, 2021, and the Motion is now ready for resolution.

**SUMMARY**

The question before the Court is whether, during the pendency of this litigation, to enjoin (in other words, stay or block) the Initiative approved by the voters of Maine on November 2, 2021, and scheduled to become law on or about

1

December 19, 2021. The answer to the question requires a careful weighing of four factors.

As to the legal question at the heart of the dispute, the Court determines that allowing the Initiative to become law will not violate Plaintiffs' constitutional rights or constitutional principles. The vested rights doctrine does not apply, and to the extent it does, Plaintiffs' rights to continue building the corridor did not vest. The Court also concludes the Initiative does not violate Separation of Powers principles or the Contracts Clause. Plaintiffs have not demonstrated a substantial possibility of prevailing on the merits. The applicable law, however, is uncertain on many disputed points. Thus, while the Court is unpersuaded by Plaintiffs' legal arguments, this case presents many difficult questions. Plaintiffs have legitimate counter arguments on all disputed points of law.

But the existence of such counter arguments, even if they were to constitute a substantial possibility of prevailing on the legal merits, are not enough to stay the Initiative, because the other factors are determinative. The Court finds that allowing the Initiative to become law during the litigation will not cause Plaintiffs irreparable injury. The litigation is moving rapidly, and the Court anticipates it will continue to do so. The public interest in participatory democracy is paramount and would be adversely affected by blocking the Initiative. And while the economic harm to Plaintiffs brought about by delaying construction of the corridor during the litigation will be substantial, that harm does not outweigh the harm to voter confidence and participatory democracy that would result from preventing the Initiative from

becoming law while this legal challenge is pending. Hence, the Court declines to prevent the Initiative from going into effect.

This is not a decision the Court reaches lightly given the countervailing considerations at issue. On the one hand, a major commercial enterprise attempting to build a large linear project in Maine, and multiple other interested parties, seek to avoid significant financial losses and protect their investment. On the other hand, the Initiative's architects and the people of Maine seek to prevent the disturbance of Maine lands and impose additional requirements for approval of projects like the one at issue here. The Court understands and respects the substantial interests and stakes on each side of the dispute. Resolution of the dispute carries regional and national implications.

Of course, the Court's decision on Plaintiffs' Motion is by no means the last word. Plaintiffs and supporting Intervenors can file an interlocutory appeal or move to have the questions of law reported to the Law Court pursuant to M.R. App. P. 24(c). If the latter, this Court will expeditiously grant the motion to report. Either way, the questions of law presented by this case are important and "ought to be determined by the Law Court." *Id.* The Law Court may interpret its precedents differently than does this Court. As but one example, it may be a better reading of the precedent to apply the vested rights doctrine to consideration of state-wide laws, and to conclude that the vesting factors are satisfied. If the Law Court determines that allowing the Initiative to become law works a constitutional violation on any basis, that determination would likely change the trajectory of the case. On remand (or directly

3

by the Law Court), the finding of a constitutional violation would likely satisfy the requirement for irreparable harm, supersede the will of the voters, and change the balance of harms in favor of Plaintiffs. Under those circumstances, staying the Initiative would be appropriate.

In the meantime, as more fully explained below, the Court denies Plaintiffs' Motion for Preliminary Injunction. The Court determines that, at this stage of the proceeding, there is no basis to block the Initiative from going into effect as scheduled.

## STATEMENT OF FACTS

Plaintiffs in this action are NECEC Transmission LLC and Avangrid Networks, Inc. (collectively "Plaintiffs" or "NECEC").[1] Intervenors in support of Plaintiffs are Cianbro Corporation, H.Q. Energy Services (U.S.) Inc. ("HQUS"), Industrial Energy Consumer Group ("IECG"), International Brotherhood of Electrical Workers Local 104 ("IBEW"), and Maine State Chamber of Commerce. Defendants are Bureau of Parks and Lands, Maine Department of Agriculture, Conservation and Forestry, Maine Public Utilities Commission, Maine Senate, and Maine House of Representatives (collectively "Defendants"). Intervenors in support of Defendants are NextEra Energy Resources, LLC, Natural Resources Council of Maine, Christine M. Geisser, Wendy A. Huish, Jonathan T. Hull, Thomas B. Saviello, Theresa E. York, and Robert C. Yorks.

No party requested an evidentiary hearing. All parties opted to proceed based upon the pleadings, well supported briefs, and oral argument. Accordingly, based

---

[1] Avangrid Networks, LLC, owns NECEC, and is the indirect parent company of Central Maine Power Company ("CMP").

4

upon the Verified Complaint, briefs, affidavits, exhibits, and stipulations made during oral argument, the Court finds the following facts based upon a preponderance of the evidence. Because of the many overlapping chronologies, the presentation of facts is organized topically to assist the reader. However, the overall sequence of events is important to the analysis.

### *Introduction to the Project*

In response to requests for proposals for a clean energy supply by Massachusetts electric distribution companies ("EDCs"), Central Maine Power Company ("CMP") and Hydro-Québec proposed the project at the heart of this action (the "Project"). The Project would transmit power from Québec through Maine and into Massachusetts. The Project consists of a 145.3-mile-long High Voltage Direct Current ("HVDC") transmission line running from the U.S./Canadian border in Beattie Township, Maine to a new converter station in Lewiston, Maine, which will connect to an existing substation by a new 1.2-mile High Voltage Alternating Current transmission line, as well as other network upgrades.

The Project is divided into five segments: (1) 53.1 miles of HVDC line running along a new corridor from Beattie Township to the Forks Plantation; (2-3) approximately 92 miles of transmission line along an existing corridor which will be widened; and (4-5) network upgrades, including a 26.5-mile AC transmission line from Lewiston to Wiscasset. Segment 1 is the most controversial, as a new corridor must be cut through commercial timberland. The segment will cross hundreds of wetlands and waterways as well as bird habitats and vernal pools. Additionally, a

300-foot-wide, 0.9-mile-long stretch of Segment 1 of the Project corridor is planned to cross over public reserved lands, administered by the Maine Bureau of Parks and Lands ("BPL"), in Johnson Mountain Township and West Forks Plantation.

CMP ultimately transferred its rights and responsibilities in the Project to Plaintiff New England Clean Energy Connect LLC ("NECEC"), which will construct and operate the Project. Both CMP and NECEC are subsidiaries of Plaintiff Avangrid Networks, Inc. ("Avangrid Networks"). Avangrid Networks is a wholly owned subsidiary of Avangrid, Inc., a publicly traded, sustainable energy company with approximately $38 billion in assets that operates in twenty-four U.S. States. Its two primary lines of business are Avangrid Networks, which owns eight electric and natural gas utilities, including CMP, and serves 3.3 million customers across New England and New York, as well as Avangrid Renewables, which owns and operates 8.5 gigawatts of electricity capacity in twenty two states.

*Permitting*

By July 2017, CMP had obtained sufficient control of the proposed Project corridor to begin seeking the requisite permits for the Project. On September 27, 2017 CMP filed a petition for a Certificate of Public Convenience and Necessity ("CPCN") from the Public Utilities Commission ("PUC"), as required for this level of voltage in a transmission line pursuant to 35-A M.R.S. § 3132. The PUC reviewed the petition over nineteen months, held six days of evidentiary hearings and three public witness hearings, and thirty-one parties participated in the proceedings. The PUC granted the CPCN on May 3, 2019, based on the Commission's finding that the Project is in

the public interest, considering the anticipated reduction in electricity prices, increased system reliability, and displacement of fossil-fuel energy generation.[2] NextEra Energy Resources, LLC ("NextEra"), an owner of an oil-fired electric generation facility in Yarmouth, Maine appealed the issuance of the CPCN. On March 17, 2020 the Law Court denied NextEra's appeal, thereby affirming the grant of the CPCN for the Project.[3]

In September 2017, NECEC also applied for permits from the Department of Environmental Protection ("DEP") under the Site Location of Development Act ("SLODA") and Natural Resources Protection Act ("NRPA"), as well as a Land Use Planning Commission ("LUPC") Site law Certification of Compliance. 38 M.R.S. §§ 480-C, 483-A. In May 2019, the DEP and LUPC began joint hearings on CMP's permit applications. Thirty-nine parties participated in the review of the Project, six days of evidentiary hearings were held, and two days of public testimony were heard. On May 11, 2020 the DEP approved NECEC's permits, incorporating LUPC's certification, with thirty-eight conditions.

NextEra, the Natural Resources Council of Maine ("NRCM"), and petitioners residing in the West Forks area appealed the grant of the DEP permits to the Superior Court and the Maine Board of Environmental Protection ("BEP"). In November 2020, NRCM and the West Forks petitioners moved the Superior Court for a stay of the DEP order, and in January 2021, the Superior Court denied the motion,

---

[2] The PUC's approval of the CPCN spurred the first initiative effort, as will be discussed in a later section.
[3] *NextEra Energy Res., LLC v. Me. Pub. Utils. Comm'n,* 2020 ME 34, 227 A.3d 1117.

finding the movants had not established a substantial likelihood of success on the merits.[4] The appeal of the DEP order to the BEP is still pending. On November 23, 2021 the DEP Commissioner suspended the DEP permits pending the outcome of the instant motion for preliminary injunction—the suspension will be lifted if NECEC obtains the injunction or, if the injunction is denied, NECEC prevails on the merits. *See Central Maine Power Co. & NECEC Transmission, LLC*, License Suspension Proceeding, Decision and Order 12 (Me. D.E.P. Nov. 23, 2021).

On September 29, 2017 NECEC applied for a permit from the U.S. Army Corps of Engineers under Section 404 of the Clean Water Act and then sought further approval under Section 10 of the Rivers & Harbors Act (together, the "ACE Permit"). The Corps attended the DEP hearings, considered the evidence before the DEP, accepted written public comments, held its own public hearing, and considered relevant evidence under the National Environmental Policy Act. The Corps also completed an Environmental Assessment ("EA") for the Project on July 7, 2020 which included a Finding of No Significant Impact ("FONSI"). The Corps completed an addendum to the EA on November 4, 2020 and issued the ACE Permit on November 6, 2020. Prior to its issuance, on October 27, 2020, the Sierra Club, NRCM, and Appalachian Mountain Club (together, "Sierra Club") sued the Corps, alleging the EA was insufficient and that the Corps should complete a full Environmental Impact Statement in its place. On November 11, 2020 the Sierra Club moved for a preliminary injunction to halt construction of the Project; the motion was denied on

---

[4] *NextEra Energy Res., LLC v. Dep't of Env't. Prot.*, Dkt. Nos. KEN-AP-20-27, SOM-AP-20-04 (Me. Sup. Ct. Jan. 11, 2021).

December 16, 2020.[5] The Sierra Club filed an emergency appeal, and on January 15, 2021 the First Circuit granted a partial injunction pending appeal, enjoining construction in Segment 1 of the Project. This temporary injunction was vacated on May 13, 2021.[6] The Sierra Club lawsuit is still pending in the District Court for the District of Maine.

On July 17, 2017 CMP applied for a Presidential Permit from the U.S. Department of Energy as required under Executive Order 10,485, as amended by Executive Order 12,038 due to the Project's Beattie Township segment at the U.S./Canada border. The DOE developed its own administrative record and prepared its own EA and FONSI. The DOE issued the Presidential Permit on January 14, 2021.[7] Sierra Club then amended its complaint in the pending *Sierra Club v. U.S. Army Corps of Eng'rs* to include claims relating to the Presidential Permit.

NECEC has obtained various municipal permits and approvals in accordance with local requirements, including *inter alia* shoreland zoning permits, building permits, rezoning/conditional use approvals, site plan approvals, demolition permits, and utility location permits. Due to the Project's construction schedule, permits and approvals have not yet been acquired from four remaining municipalities which the Project will need to cross.

---

[5] *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 2:20-cv-00396-LEW, 2020 WL 7389744 (D. Me. Dec. 16, 2020).

[6] *Sierra Club v. U.S. Army Corps of Eng'rs*, 997 F.3d 395 (1st Cir. 2021).

[7] *NECEC Transmission LLC*, DOE Docket No. PP-438, Presidential Permit (DOE Jan. 14, 2021); *New England Clean Energy Connect*, DOE/EA-2155, Environmental Assessment (DOE Jan. 14, 2021); *New England Clean Energy Connect*, Finding of No Significant Impact (DOE Jan. 14, 2021).

*Public Lands Lease*

In 2014, CMP obtained a lease from BPL to construct electric transmission facilities across public reserved lands in Johnson Mountain Township and West Forks Plantation. Neither BPL nor CMP had sought approval from the Maine Legislature. In December 2019, prompted by his concerns about this lease, Senator Russell Black introduced a bill, LD 1893, which would have reinforced the requirement of legislative approval and fair market value for leases of public lands by the State. The bill was subsequently referred to the Agriculture, Conservation and Forestry Committee ("ACF"), which has oversight authority of BPL.

The ACF held a public hearing on the bill in January 2020 at which Director Cutko of BPL testified that the Bureau had not sought legislative approval for the 2014 lease to CMP because (i) BPL believed it was authorized to grant the lease under 12 M.R.S. § 1852, and (ii) BPL was not aware of the requirement for PUC to issue a CPCN prior to the execution of a lease over public land under 35-A M.R.S. § 3132(13). Then-House Chair Hickman, believing the 2014 BPL lease was a violation of Art. IX, Sec. 23 of the Maine Constitution, which requires any action that reduces or substantially alters the use of public lands held for conservation or recreation purposes to be approved by a two-thirds majority of both houses of the Legislature, drafted Committee Amendment A to LD 1893. This amendment clarified that the Project constitutes a substantial alteration of public lands and is thus subject to the two-thirds vote requirement. In February 2020, the ACF unanimously voted to recommend that LD 1893, as amended, should pass. However, no vote was taken in

10

either chamber due to the adjournment resulting from the COVID-19 pandemic and the bill died at the conclusion of the 129th Legislature.

On June 23, 2020 BPL and CMP entered an amended and restated transmission line lease agreement ("BPL Lease"), assigned to NECEC on January 4, 2021, for a 0.9-mile transmission line corridor through public reserved lands in Johnson Mountain Township and West Forks Plantation under 12 M.R.S. § 1852(4), explicitly superseding the 2014 lease for the same. The BPL Lease provides that the Project "shall be in compliance with all Federal, State and local statutes, ordinances, rules, and regulations, now or hereinafter enacted which may be applicable to [the Project] in connection to its use of [the public reserved land]." The BPL Lease also provides that BPL has the right to request its amendment "if any Lease term is found not to comply with Maine state law regarding public reserved lands."

At the end of June 2020, Senator Black filed a complaint in the Superior Court, seeking judicial review of the Lease and the potential application of Art. IX, Sec. 23 of the Maine Constitution. The Court issued a preliminary ruling on March 17, 2021, holding that leases executed under 12 M.R.S. § 1852(4) are not necessarily exempt from legislative approval. The Court on August 10, 2021 issued its final Decision and Order, reversing the grant of the BPL Lease.[8] BPL and NECEC's appeal of that decision is currently pending at the Law Court, during which time the decision's effect is stayed under M.R. Civ. P. 62(e).[9] The automatic stay notwithstanding, the Law

---

[8] *Black v. Cutko*, BCD-CV-2020-29, 2021 WL 3700685, at *5 (Me. B.C.D. Aug. 10, 2021).

[9] There appears to be some disagreement among the parties as to the effect of an appeal of a final order of this Court. Pursuant to rule M.R. Civ. P. 62(e), "the taking of an appeal from a judgment shall operate as a *stay of execution* upon the judgment during the pendency of the appeal." (Emphasis

Court issued an agreed-upon order prohibiting NECEC from building on the leased property until the legal questions have been resolved.

### *Voter Initiatives*

On August 29, 2019, a group of voters filed an application for a citizens' initiative targeting the May 3, 2019 CPCN order, seeking to force the PUC to make new findings of fact and reverse its decision. On May 12, 2020, after the Law Court affirmed the Secretary of State's verification of the petition signatures, thereby certifying the initiative for public vote in November 2020, Avangrid Networks challenged the initiative as unconstitutional and sought to bar it from the ballot. *See Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, 236 A.3d 882. The Law Court agreed and on August 13, 2020, just one month after opening briefs were filed on July 14, 2020, held that the initiative was "not legislation" because it required the PUC to "reverse its findings and reach a different outcome in an already-adjudicated matter." *Id.* ¶ 36.

On or about September 15, 2020, voters filed an application for a second citizens' initiative—the one at issue here (the "Initiative"), and the Secretary of State issued the petition on October 30, 2020. Comporting with the statutory requirements of 21 M.R.S. §§ 901-907, a group of Maine voters circulated the Petition and obtained enough signatures to achieve submission of the petition to the electors for

---

supplied). The text of this rule is clear; what is stayed by the decision to appeal is the *enforcement* of the Court's order vacating the BPL lease. As of now, however, the BPL Lease stands as void in the eyes of the law.

consideration in accordance with art. IV, section 18(2) of the Maine Constitution.[10] On February 22, 2021, the Secretary of State certified that the proponents of the Initiative had gathered enough signatures for submission of the Initiative to the Legislature. The certified petition was printed by the Legislature's Revisors Office as LD 1295.[11] A copy of LD 1295 is attached as Exhibit D to Plaintiffs' Verified Complaint.

LD 1295 (a copy of which is also attached for convenience to this Order) proposed a bill with twofold effect, retroactively amending Titles 12 and 35-A of the Maine Revised Statutes. First, in Section 1, LD 1295 amends BPL's authority to lease public reserved lands for certain linear projects by providing that "poles, transmission lines and facilities, landing strips, pipelines and railroad tracks under this subsection are deemed to substantially alter the uses of the land within the meaning of the Constitution of Maine, Article IX, Section 23, and [such a lease] may not be granted without first obtaining the vote of 2/3 of all the members elected to each House of the Legislature." It also states that "this provision applies retroactively to September 16, 2014."

Second, in Sections 4 and 5, LD 1295 adds three new provisions relating to electric transmission lines in particular, specifying that (i) "a high-impact electric

---

[10] At least 10% of the total number of votes cast in the gubernatorial election preceding the filing of the petition. Me. Const. art. IV, § 18.

[11] When a finalized petition for direct initiative is submitted to the Maine Secretary of State's Office and certified, the change in law that the petition purports to make is printed by the Maine Legislature Revisors Office as a Legislative Document ("LD"). That LD serves as the initial draft which may be amended, enacted, or rejected by the Legislature in a final vote. Here, the Initiative was printed as LD 1295 for consideration by the Legislature and this is the document from which the ballot question was subsequently drafted.

transmission line may not be constructed anywhere in the State without first obtaining the approval of the Legislature," with a supermajority needed if the line uses or crosses public lands; (ii) notwithstanding the prior subsection, construction of high-impact electric transmission lines in a defined region of Franklin and Somerset Counties is banned altogether; and (iii) these new restrictions "apply retroactively to September 16, 2020 and apply to any high-impact electric transmission line the construction of which had not commenced as of that date." LD 1295 does not explicitly mention the Project, but its cumulative effect would be to block completion of the Project, potentially indefinitely.

Prior to adjournment *sine die* on March 30th, 2021, the Legislature failed to act on LD 1295. *See* Me. Const. art. IV, § 18(2). Accordingly, on April 8, 2021, pursuant to her Constitutional obligation in the absence of Legislative action on a direct initiative, the Governor referred the Initiative "to the people at an election to be held in November" of 2021. Me. Const. art. IV, § 18(3). Pursuant to 21 M.R.S. § 906, the Secretary of State received the Governor's proclamation and prepared a combined ballot that sufficiently posed a question to the Maine people regarding the enactment of LD 1295. The wording of the question reducing LD 1295 to a concise "yes or no" statement was as follows:

> Do you want to ban the construction of high-impact electric transmission lines in the Upper Kennebec Region and to require the Legislature to approve all other such projects anywhere in Maine, both retroactively to 2020, and to require the Legislature, retroactively to 2014, to approve by a two-thirds vote such projects using public land?[12]

---

[12] The decision to reduce LD 1295's language into a single ballot question was affirmed by the Law Court in *Caiazzo v. Sec'y of State*, 2021 ME 42, 256 A.3d 260.

14

As with LD 1295, the ballot question does not expressly mention the Project, but because of the retroactivity provisions, the ballot question applies to the Project.

Avangrid Networks' parent company Avangrid, Inc. disclosed the Initiative, as well as the various pending lawsuits related to the Project, in its October 30, 2020 10-Q report to the Securities and Exchange Commission ("SEC"). Avangrid, Inc. stated that it "[could] not predict the outcome of this citizen initiative." The Initiative was certified for submission to the Legislature on February 22, 2021. In its 10-K report to the SEC of March 1, 2021, Avangrid, Inc. noted that among "strategic risk factors" potentially causing delays, budget overruns, or cancellations regarding the Project were "regulatory approval processes, permitting, new legislation, citizen referendums or ballot initiatives" which could "have an adverse effect on the success of the [Project] and our financial condition and prospects."

Proponents of the Initiative included a political action committee, "No CMP Corridor," which repeatedly stated that the purpose of the Initiative was to stop the Project. After the final wording of the question for the ballot was issued, No CMP Corridor issued a statement praising the drafting and stated that the people of Maine will "have the opportunity to vote on the fate of the destructive CMP Corridor." Proponents of the Initiative sought public support by emphasizing that a "yes" vote would block the Project.

On November 2, 2021, the Initiative was approved by a 59% majority of voters. It is scheduled to take effect on or about December 19, 2021.

### Project Expenditures, Operations, and Impacts

15

In 2018, the EDCs selected CMP and Hydro-Québec's proposal, i.e., the Project, for delivering clean energy to Massachusetts. Subsequently, CMP and Hydro-Québec, through its U.S. affiliate H.Q. Energy Services (U.S.) Inc. ("HQUS"), entered contracts obligating CMP to provide 1,200 MW of transmission services to HQUS and the EDCs for a period of forty years. HQUS also agreed to sell 1,090 MW of energy to the EDCs for the first 20 years of the Project. HQUS can use its remaining transmission capacity, i.e., 110 MW per year for the first twenty years and 1200 MW for the second twenty years, to sell additional energy into the New England markets, including Maine.

NECEC anticipated beginning construction of the Project on December 4, 2019. However, the final permit required for construction, the Presidential Permit, was not received until January 14, 2021. Consequently, NECEC did not commence clearing and construction activities in Segments 2-5 of the Corridor until January 18, 2021, and in Segment 1, apart from public reserved lands, until May 15, 2021. Such delays in large-scale transmission line projects are common, if not inevitable.

As of the filing of the instant complaint, NECEC has spent nearly $450 million on the Project, representing 43% of the total cost estimate, and has undertaken substantial physical construction, including cutting approximately 124 miles of right-of-way for direct current line, clearing the entire alternating current line corridor, erecting transmission structures along the Project corridor, and preparing the converter station site. NECEC anticipates that approximately 97% of the corridor

would have been cut by the end of 2021.[13] Continued construction will create approximately 300 new direct jobs in addition to the roughly 600 direct jobs currently related to the Project. NECEC believes that the completion of the Project will provide Maine with lowered electricity costs, improved transmission supply and reliability, reduced greenhouse gas emissions, $18 million in annual property taxes, and $250 million of value in rate relief, economic development, and education-related benefits. The current estimate for the total cost of the Project is approximately $1.04 billion.

As for Segment 1, which includes the portion of the Upper Kennebec Region in which the Initiative seeks to prohibit all high-impact transmission lines and the public lands subject to the BPL Lease, cutting commenced on May 15, 2021 following the First Circuit's vacating of its January 15, 2021 partial injunction of construction activities in this segment. No cutting, clearing, or associated construction has been undertaken yet on the public reserved lands. Presently, all work on the Project corridor is suspended due to the DEP's suspension of its permits pending the outcome of the instant motion. Central Maine Power Co. & NECEC Transmission LLC, License Suspension Proceeding, Decision and Order 11 (Me. D.E.P. Nov. 23, 2021). Because this Court is not granting a preliminary injunction to stay the Initiative, the DEP permits will remain suspended until a final disposition of NECEC's legal challenge to the Initiative. *Id.* at 12. The DEP, as part of its order, requires NECEC to stabilize disturbed soils, spread all piles of wood chips and grindings, and stabilize

---

[13] This estimate was provided before NECEC suspended operations to extend the corridor.

off-corridor access roads, as well as backfill or cover uncompleted structure foundations or bore holes. *Id.* No new vegetation may be cut. *Id.*

Plaintiffs originally contractually agreed that the commercial operation date for the Project would be December 13, 2022. At present, the schedule envisions a December 13, 2023 commercial operation date, assuming no further delays, with a contractual deadline of August 23, 2024. NECEC may extend this deadline to August 23, 2025 by posting up to $10.9 million of additional security. Suspending operations comes at a cost. Without sufficient work, contractors hired for construction activities on the Project would have to either standby or demobilize and later remobilize. The approximate cost to standby is $742,000 per week and the approximate cost to demobilize is $1,542,000. NECEC estimates that an 18-month delay would incur $113 million in additional costs and a 24-month delay would incur $137 million, representing approximately 11% to 13% of the total project budget.

## STANDARD OF REVIEW

A party seeking a preliminary or permanent injunction generally has the burden of demonstrating that the following four criteria are met:

1. That plaintiff has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility);

2. That plaintiff will suffer irreparable injury if the injunction is not granted;

3. That such injury outweighs any harm which granting the injunctive relief would inflict on the defendant; and

4. That the public interest will not be adversely affected by granting the injunction.

*Department of Environmental Protection v. Emerson*, 563 A.2d 762, 768 (Me. 1989). These criteria "are not to be applied woodenly or in isolation from each other; rather, the court of equity should weigh all of these factors together in determining whether injunctive relief is proper in the specific circumstances of each case." *Id.* The emphasis a court places on any single criterion can vary depending upon the relative strength of the other criteria. *Id.* However, "[f]ailure to demonstrate that any one of these criteria are met requires that injunctive relief be denied." *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.*, 2003 ME 140, ¶ 10, 837 A.2d 129. Where the public interest is involved, "the court's equitable powers assume an especially broad and flexible character." *State v. DeCoster*, 653 A.2d 891, 895 (Me. 1995).

Because injunctive relief is an equitable remedy, and thus discretionary, a court's denial of the requested relief "must stand unless plainly wrong or based on an error of law." *Emerson*, 563 A.2d at 768 (quoting *Crafts v. Quinn*, 482 A.2d 825, 830 (Me. 1984)). "[F]act-finding that is a prerequisite for judicial action, such as a finding of irreparable injury, or lack thereof, is reviewed for clear error." *Bangor Historic Track*, 2003 ME 140, ¶ 11, 837 A.2d 129.

## DISCUSSION

The Court's analysis is organized around the four preliminary injunction factors and explains why none of the factors are met under the circumstances of this case.

## I. Success on the Merits

NECEC raises several legal theories which, it argues, create a substantial possibility of success on the merits. NECEC posits that the Initiative should be invalidated because it is unconstitutional as (i) an unlawful deprivation of its vested rights in the Project; (ii) a violation of separation of powers principles enshrined in the U.S. and Maine Constitutions; and (iii) an impairment of the Contracts Clause of the U.S. and Maine Constitutions.[14] The fact that the law at issue was enacted by a public referendum rather than the Legislature does not alter the requirement that the law comport with the Constitution. *Citizens Against Rent Control/Coal. For Fair Housing v. City of Berkeley*, 454 U.S. 290, 295 (1981). However, "the constitutional validity of a citizens' initiative is evaluated under the ordinary rules of statutory construction" and thus the Initiative carries a "heavy presumption of constitutionality" which NECEC must overcome. *Portland Reg'l Chamber of Commerce v. City of Portland*, 2021 ME 34, ¶ 7, 253 A.3d 586 (quoting *League of*

---

[14] Intervenor HQUS also raises an additional, independent argument that the Initiative violates the Articles of Separation ("Articles") which preceded Maine's statehood and solidified Maine's separation from the Commonwealth of Massachusetts in 1820. Specifically, they assert that the Articles reserved certain public lots—including the ones subject to the BPL Lease—for certain "beneficial uses" and that the Law Court, in *Opinion of the Justices*, 308 A.2d 253 (Me. 1973), defined that term broadly to mean "public uses." *Id.* According to HQUS—as has been asserted many times by NECEC—the Project is a public use, and thus the Initiative violates the Articles' provisions. The Court however is unconvinced by this argument and doubts whether HQUS, a non-sovereign party or intended beneficiary, has standing to assert a claim for violation of the Articles. Additionally, HQUS was not an intended third-party beneficiary of the Articles, *see, e.g.*, *Davis v. R C & Sons Paving, Inc.*, 2011 ME 88, ¶ 12, 26 A.3d 787, nor is it likely that an interstate compact such as the Articles creates a cause of action under which private citizens may bring suit. *See, e.g., Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 107 (3d Cir. 2008).

*Women Voters v. Sec'y of State*, 683 A.2d 769, 771 (Me. 1996)). With this guidance in mind, the Court addresses NECEC's arguments in turn.[15]

## A. Vested Rights

NECEC contends that the Initiative deprives it of vested rights in the Project. Defendants respond first that "vested rights" is not the proper analysis for retroactive State legislation. Even if it is, argue Defendants, NECEC's rights did not vest on the facts of this case. The Court agrees with both propositions, while at the same time acknowledging that Plaintiffs have legitimate arguments to the contrary, since until recently the vested rights jurisprudence has been unclear.

### 1. Vested Rights Analysis Does Not Apply to Retroactive Statutes.

In *Norton v. C.P. Blouin, Inc.*, 511 A.2d 1056, 1061 n.5 (Me. 1986), *abrogated on other grounds by DeMello v. Dep't of Envtl. Prot.*, 611 A.2d 985 (Me. 1992), the Law Court "clarified the proper analysis concerning the retroactive application of statutes." *State v. L.V.I. Group*, 1997 ME 25, ¶ 9, 960 A.2d 690. If the Legislature

---

[15] The Court acknowledges that Defendants have raised a sovereign immunity defense to this suit. Because the Court denies Plaintiffs' Motion, the Court only briefly addresses the defense. As the Law Court noted in *Waterville Indus. v. Finance Auth. of Maine*, "a claim against the State will be dismissed unless the State, acting through the Legislature, has given its consent that the present action be brought against it." 2000 ME 138, ¶ 21, 758 A.2d 986. To date, Maine courts have failed to recognize an exception to sovereign immunity that allows for suit against constitutionally derived branches of government. And, under the multifactored test for determining sovereign immunity recited by the First Circuit in *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, the Maine House and Senate seemingly qualify. 991 F.2d 935, 939 (1st Cir. 1993); *see also Reed v. Bd. of Trs.*, No. CV-08-155, 2008 Me. Super. LEXIS 214 (Dec. 4, 2008). However, the context in which this suit arises—an action seeking declaratory judgment regarding constitutionality—muddies the availability of the sovereign immunity defense. Several courts in other states have held that in such cases, sovereign immunity is unavailable as a defense. *See Jones v. Bd. of Trs. of Ky. Retirement Sys.*, 910 S.W.2d 710, 713 (Ky. 1995) (holding legislature immune to constitutional claim "would undermine and destroy the principle of judicial review" and leave "no redress for the unconstitutional exercise of legislative power"); *see also Claremont Sch. Dist. v. Governor*, 761 A.2d 389, 391 (N.H. 1999); *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 75–76 (Tex. 2015). The Court is inclined to agree with this line of cases, because the availability of judicial review here appears to be integral to the constitutional framework, and not subject to a sovereign immunity defense.

intends for the provisions of a statute to apply retroactively,[16] the statute must be so applied "unless a specific provision of the state or federal constitution is demonstrated to prohibit such action by the Legislature." *Norton*, 511 A.2d at 1061 n.5. Here, both the wording of the Initiative and LD 1295 clearly and explicitly intend for changes in the law to apply retroactively. There is thus no question of Legislative intent. The question is whether the doctrine of vested rights necessarily invokes a constitutional provision such that the retroactivity analysis applies.

The etymology of the vested rights doctrine is confusing. *See id.* Prior to *Norton*, the Law Court appears to have used the phrase "vested rights" as a heuristic when determining that a retroactive statute is unconstitutional, "without identifying the source of the constitutional prohibition." *Norton*, 511 A.2d at 1061 n.5. Indeed, the parties have not brought to the Court's attention any case that expressly grounds the doctrine on a specific constitutional provision.[17] Rather, the doctrine of vested rights appears to be an equitable concept, derived by implication from the state and federal constitutions (but without attribution to any specific provisions), and developed (especially in the municipal context) through a process of judge-made constitutional common law. *See, e.g., Coffin v. Rich*, 45 Me. 507, 514-15 (1858); *Baxter v. Waterville Sewage Dist.*, 79 A.2d 585, 588 (Me. 1951); *Thomas v. Zoning Bd. Of*

---

[16] If some provisions of LD 1295 can be characterized as procedural, such as possibly the Initiative's requirement for two thirds approval by the Legislature, then those provisions might not be considered retroactive. *Norton, Inc.*, 511 A.2d at 1061 n.5. It is unclear, however, whether the procedural-substantive distinction retains any vitality after *DeMello. See DeMello*, 611 A.2d at 987. No party has addressed the procedural-substantive argument, and the Court does not address it further.

[17] At oral argument, Plaintiffs asserted that the doctrine of vested rights, in and of itself, is a fundamental right. Plaintiffs have not brought to the Court's attention any case expressly holding that vested rights are a fundamental constitutional right, and the Court is not aware of any such case.

*Appeals*, 381 A.2d 643, 647 (Me. 1978); *Merrill v. Eastland Woolen Mills, Inc.*, 430 A.2d 557, 560 n.7 (Me. 1981); *cf.* Henry Paul Monaghan, *Constitutional Common Law*, 89 Harv. L. Rev. 1, 10 (1975). As such, the vested rights doctrine cannot be invoked to defeat the retroactivity provisions of the Initiative.

As clarified in *L.V.I. Group*, a party seeking to demonstrate the unconstitutionality of a retroactive state statute must ground its challenge on a specific provision of the Maine or U.S. Constitutions. 1997 ME 25, ¶¶ 9-16. In *Norton*, for instance, the employer argued that retroactively applying a change in the Maine Workers' Compensation Act, 39 M.R.S. § 194-B, would "impermissibly impair contractual rights in violation of *Me. Const. art. I, § 11." Norton,* 511 A.2d at 1061 (emphasis added). In *L.V.I. Group*, the employer mounted attacks on a retroactive change to Maine's severance pay statute, 26 M.R.S. § 625-B, based on the Due Process Clauses of the Maine and United States Constitutions, *Me. Const. art. I, § 6-A; U.S. Const. amend. XIV, § 1*; the Takings Clauses of both constitutions, *Me. Const. art. I, § 21; U.S. Const. amend. V*; the Equal Protection Clauses of both constitutions, *Me. Const. art. I, § 6-A; U.S. Const. amend XIV*; and several other specific constitutional provisions. The vested rights doctrine is not similarly based on any specific provision of the Maine or U.S. Constitutions, and therefore does not apply to the retroactivity analysis. Plaintiffs have not been divested of constitutionally protected vested rights.[18]

---

[18] Plaintiffs' and Intervenors' separate arguments based on Separation of Powers and the Contracts Clause are addressed later in this Order.

Even if the vested rights doctrine is of sufficient constitutional specificity to apply, it would still not be enough to defeat the clear legislative intent for the Initiative to apply retroactively. The Initiative is an exercise of state "police power" to protect the environment.[19] "The exercise of the police power in such cases violates no constitutional guarantee against the impairment of vested rights or contracts." *Baxter*, 79 A.2d at 589. The Law Court has declared that this rule "is not only reasonable, but necessary, as a contrary rule would enable individuals by their contracts, or contractual relations, to deprive the State of its sovereign power to enact laws for the public health and public welfare." *Id.* Even in the municipal context, which is discussed later, the Law Court recognizes that "all property is held in subordination to the police power." *Thomas*, 381 A.2d at 647.

In reliance on *L.V.I. Group,* 1997 ME 25, ¶ 15, 690 A.2d 960, Plaintiffs counter that the Maine Constitution forbids interference with vested rights, and the gravamen of vested rights challenges is in "due process." However, the language Plaintiffs rely on in *L.V.I. Group* is a passing reference to the employer's losing argument under the Declaration of Rights provision of the Maine Constitution, *Me. Const. art I, § 1*, not the Court's analysis of vested rights or the Due Process Clause.

---

[19] The police power of the State to make laws within its territory is "older than any written constitution. It is the power which the states have not surrendered to the nation, and which by the Tenth Amendment were expressly reserved to the states respectively or to the people." *York Harbor Vill. Corp. v. Libby*, 126 Me. 537, 540, 140 A. 382, 385 (1928). The frontiers of the police power are those "expressed or necessarily implied in the Federal Constitution." *Id.* When a fundamental right has not been implicated, the Court reviews the validity of a given statute as an exercise of this police power only for a rational basis, requiring no more than that "(1) the police powers be exercised for the public welfare; (2) the legislative means employed be appropriate to achieve the ends sought; and (3) the manner of exercising the power not be unduly arbitrary or capricious." *State v. Haskell*, 2008 ME 82, ¶¶ 5-6, 955 A.2d 737 (quotation marks omitted). The Initiative satisfies these criteria.

*L.V.I. Group* does not say that the doctrine of vested rights is synonymous with or specifically based on the Due Process Clause of either the state or federal constitutions. Indeed, in *L.V.I. Group*, unlike here, the employer actually made an argument based on the Due Process Clause. Even if NECEC had brought a Due Process Clause challenge, in addition to or as the explicit basis for its vested rights argument, it would be unavailing. "The retroactive aspects of economic legislation meet the requirements of the due process clause if enacted to further a legitimate legislative purpose by rational means." *L.V.I. Group*, 1997 ME 25, ¶ 9, 690 A.2d 960. This is the lowest level of constitutional scrutiny, and easily met by the Initiative.[20] The Initiative seeks to impose additional environmental protections, and enacting those protections through supplemental requirements contained in the Initiative is not unduly arbitrary or capricious.

Plaintiffs also rely on the body of vested rights jurisprudence developed in the context of municipal land use and zoning. *See, e.g., Sahl v. Town of York*, 2000 ME 180, 760 A.2d 266; *Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 25, 856 A.2d 1183. Unlike the Legislature (or the people of Maine acting through a public Initiative), municipalities enact zoning laws and local ordinances under their limited home-rule powers, which are intended to address issues "which are local and municipal in character." Me. Const. art. IX, § 1; *see also* 30-A M.R.S. § 3001. Local rules and ordinances are not equivalent in authority to state legislation, as the latter

---

[20] It is clear that Plaintiffs have not brought a Due Process Clause challenge, because at oral argument Plaintiffs insisted the vested rights analysis does not require any legitimate purpose/rational means analysis, which are indispensable components of a Due Process challenge.

can preempt local regulations either expressly or implicitly. *State v. Brown*, 2014 ME 79, ¶ 23, 95 A.3d 82. Cases decided in the municipal context, where the enforceability of a local ordinance is at stake, therefore, have little if any relevance to the analysis of whether a statute enacted by the Legislature can be applied retroactively. However, even if the municipal-level vested rights analysis applies, as discussed below it does not change the outcome.

2.     There is No Violation Under a Vested Rights Analysis.

As the vested rights doctrine has been developed in the municipal context, NECEC posits that the right to build a project vests under two scenarios. First, a right to build and complete a project vests, even if the law changes, when there has been (1) actual, physical commencement of significant and visible construction (2) undertaken in good faith with the intention to continue through and carry it to completion (3) pursuant to a valid permit. *Sahl*, 2000 ME 180, ¶ 12, 760 A.2d 266. Second, according to NECEC, the right to construct a project vests if the lawmakers seek to prohibit construction in "bad faith" or through "discriminatory enactment."[21] *See Littlefield v. Inhabitants of Town of Lyman*, 447 A.2d 1231, 1233 (Me. 1982); *cf. Kittery Retail Ventures LLC,* 2004 ME 65, ¶ 25, 856 A.2d 1183. NECEC asserts that its right to complete the Project vested under both scenarios. The Court, however, finds to the contrary. Even if the vested rights analysis can be lifted from the municipal context and applied to a state-wide Initiative, NECEC's rights did not vest under either scenario.

---

[21] At oral argument, Plaintiffs clarified that in their view the bad faith prong works in conjunction with the *Sahl* factors, not independently. Either way, the outcome here is no different.

26

The Court addresses NECEC's "bad faith" argument first. NECEC claims that it has vested rights to complete the Project because of the bad faith or discriminatory intent reflected in the Initiative. The Court is unwilling to credit the argument. Even when a small, municipal body enacts an ordinance, it is difficult to demonstrate bad faith on the part of the governmental body. *See Kittery Retail Ventures, LLC*, 2004 ME 65, ¶ 25, 856 A.2d 1183. NECEC has not demonstrated bad faith here. When the voters of Maine cast ballots in a state-wide Initiative, the Court is unwilling to ascribe bad faith or discriminatory intent on the part of the electorate (or the Legislature for its role in enacting the Initiative).[22] This is an illustration of why unmooring the vested rights analysis from its local, municipal application can lead to problems. Indeed, the Court questions whether as a matter of law it is possible for the citizens of a democracy to cast votes in a state-wide, public referendum other than in good faith. Perhaps there are such occasions, but this is not one of them. With regard to the Project, there is a stark—but legitimate—good faith difference of opinion and vision between Plaintiffs and Defendants (and the Intervenors aligned on each side of the dispute). The Court declines to find NECEC's rights to complete the Project vested because of bad faith or discriminatory intent on the part of the Maine electorate.

The Court next turns to consideration of the *Sahl* factors, but here too the Court begins its analysis with a discussion of good faith, this time on the part of

---

[22] The Court is also unwilling to accept Plaintiffs' invitation to find that the five individuals who sought to certify the Initiative were acting in bad faith. These individuals were merely exercising their rights under the direct initiative procedures found in the Maine Constitution, however objectionable their goals were to Plaintiffs.

NECEC. One of the *Sahl* factors requires that construction was commenced in good faith, by which the *Sahl* Court means construction was undertaken with the genuine intention to carry construction through to completion. *Sahl*, 2000 ME 180, ¶ 12, 760 A.2d 266. There can be no doubt that in this sense, NECEC has proceeded in good faith. NECEC has spent nearly $450 million on the Project, and the Project is substantially complete. That is no head fake. Just as the voters of Maine have acted in good faith, so too has NECEC. Having addressed the element of good faith, the Court next addresses the remaining *Sahl* factors.

### *Circumstances Attending Commencement of Significant Construction*

*Sahl* requires "actual physical commencement of some significant and visible construction" for rights to vest. *Id*. The question is when during the timeline to apply that measure. In some circumstances, it is appropriate to make the determination "when a municipality applies a new ordinance to an existing permit." *Id*. (quoting *Peterson v. Town of Rangeley*, 1998 ME 192, ¶ 12 n.3, 715 A.2d 930). Plaintiffs argue that by whichever Initiative date in their view should be reasonably selected (February 22, 2021, April 8, 2021, November 2, 2021, or December 19, 2021), they had commenced substantial physical construction. According to Plaintiffs, this should settle the matter.

However, the doctrine of vested rights, even in the municipal setting, is an equitable concept.[23] *Kittery Retail Ventures,* 2004 ME 65, ¶¶ 24-27. In this sense, *Sahl* does not provide inflexible requirements that must be mechanically applied, but

---

[23] At oral argument, the Maine Chamber of Commerce referred to the vested rights doctrine as "constitutional in origin but equitable in nature," and acknowledged that this is an equity proceeding.

rather an example of certain factors that should be considered as the starting point of the analysis. More broadly, when considering a matter in equity, the totality of the circumstances must be considered. *See Tarason v. Town of S. Berwick,* 2005 ME 30, ¶ 14, 868 A.2d 230. Even the *Sahl* court recognizes that there are circumstances which limit or otherwise prevent rights from vesting. *See Sahl,* 2000 ME 180, ¶ 13. Indeed, the Law Court has held that whether a developer has notice of opposition to its projects may complicate a "vested rights" argument. In *Portland v. Fisherman's Wharf Assocs. II*, the Court considered the developer's "knowledge of the contents of the proposed ordinance and its retroactive provisions" in its determination that the petitioner "failed to establish any vested rights based on equitable grounds." 541 A.2d 160, 164 (Me. 1988). Later, in *Kittery Retail Ventures*, the Law Court again factored in the developer's "knowledge of the pending ordinance changes" and again held that it was "not the case in which equity demands that [the developer] acquire vested rights." 2004 ME 65 ¶ 31, 856 A.2d 1183. NECEC's argument that these cases are irrelevant because the developers in them had not begun construction at the time that the changes in the law became pending misses the point. Both *Kittery Retail* and *Fisherman's Wharf II* stand for the proposition that a developer's awareness of a likely change in the law is relevant to the analysis of whether rights will vest upon the commencement of construction.

At the time NECEC commenced construction of the Project in Segments 2-5 on January 18, 2021, NECEC was well aware of the staunch opposition the Project faced from many citizens in Maine. An attempt to launch an initiative to stop the Project

in 2020 did not make it onto the ballot due to constitutional violations in the proposed bill, but the fact that the 2020 initiative collected enough signatures to qualify for a statewide referendum put NECEC on notice of the public's desire to effectuate a change in the law. On October 30, 2020, the Secretary of State issued the petition for the Initiative relevant to this case, reinforcing the likelihood that the Project would face legislative roadblocks, especially given the popularity of the 2020 initiative. NECEC was aware of the second Initiative and admitted in its October 30, 2020 10-Q report to the SEC that it could not predict the outcome of the referendum. NECEC commenced construction on January 18, 2021 despite this knowledge (and knowledge of all the other adverse actions to that date described in the Statement of Facts). NECEC's decision to forge ahead with construction in the face of a substantial possibility that retroactive change negatively impacting the Project could be passed in the near future was a calculated risk.

On February 22, 2021, the Initiative was certified for submission to the Legislature. Sometime between October 2020 and March 2021, the text of LD 1295 was released. On March 1, 2021, Avangrid, Inc. disclosed in its 10-K report to the SEC that "new legislation" and "citizen referendums and ballot initiatives" were strategic risk factors potentially causing delays, budget overruns, and cancellation of the Project. On March 17, 2021, this Court issued its preliminary ruling that the public land leases were not necessarily exempt from legislative approval. On April 8, 2021, the Governor referred the Initiative to the voters for the November election. Thus, by the time NECEC started construction in Segment 1 on May 15, 2021, its

knowledge about a potential change in the law applying retroactively to the Project was further heightened. NECEC started construction in Segment 1 under intense risk that a change in the law would have an adverse impact on the success of the Project. Under the totality of the circumstances, NECEC's rights to complete the Project did not vest upon commencement of substantial construction.[24]

### *Valid Permit*

Under *Sahl*, construction must be commenced "pursuant to a validly issued building permit." 2000 ME 180, ¶ 12, 760 A.2d 266. Defendants argue that in order to vest rights, however, the permit in question must be final, meaning that the appeal period must have run.[25] The *Sahl* Court was not faced with this question, and the Law Court appears not to have addressed it.

NECEC argues that the requirement for a valid permit means only that a developer cannot vest rights to a permit which is illegal at the time of issuance, but cannot cite a Maine case to support this contention. NECEC points to the West Virginia case of *Harding v. Board of Zoning Appeals*, 219 S.E.2d 324, 332 (W.V. 1975), but that case stands for the unremarkable proposition that rights will not vest pursuant to permits that were improperly granted. *Id.* (holding owners of building

---

[24] At oral argument, IECG asserted that denying the Motion would constitute a "flashing red light" to energy companies interested in doing business in Maine. While that may or may not be the case, the visual is useful. Here, the evidence establishes that upon commencement of construction, both in January and May 2021, Plaintiffs themselves were faced with a flashing red light about the risks of proceeding with the Project.

[25] Plaintiffs concede that since permits can be vacated on appeal, developers run the risk of proceeding with commencement of construction before the end of the relevant appeal periods (or before the end of litigation appealing grant of the permits). Although Plaintiffs argue that with a permit in hand they are at least shielded from the risk posed by subsequent changes in the law, Plaintiffs tacitly concede that even under their argument, rights do not completely vest upon issuance of a permit.

who incurred expenditures in adding apartments to building did not acquire vested rights because their initial conditional use permit was improperly granted). *Harding* cannot reasonably be construed to cabin the analysis to that one scenario.

Contrary to NECEC's position, at least one trial court in Maine has held that the right to build under a permit does not vest while that permit is on appeal. *Conservation Law Found., Inc. v. State*, No. AP-98-45, 2002 Me. Super. LEXIS 15 at *11 (Jan. 28, 2002) (holding that vested rights in permit do not exist "simply by virtue of its issuance because it was challenged in a timely and procedurally correct fashion"). Courts in other states agree with this approach. *See, e.g., Powell v. Calvert Cty.*, 795 A.2d 96, 1010 (Md. 2002) (holding that until all necessary approvals are final, "nothing can vest or even begin to vest"). The case of *Donadio v. Cunningham*, 277 A.2d 375, 382 (N.J. 1971), is particularly instructive. In *Donadio*, the McDonald's Corporation argued that it attained the equitable right to build a restaurant by initiating construction immediately following a successful trial over a zoning ordinance but long before the time for appeal had expired. *Id.* That court held that it was in the public interest that "no such overriding rights may be acquired when the acts relied upon are done prior to the end of the appeal period" and chastised the McDonald's Corporation for attempting to "thwart that public interest . . . by winning an unseemly race." *Id.* This Court finds persuasive the approach and reasoning of these cases. In order to merit protection as a vested right, under the unique facts presented here, the permits relied upon must be final and not subject to appeal.

In this case, NECEC acquired the last permit required for construction on the Project to begin, the Presidential Permit, on January 14, 2021, and began construction shortly thereafter, on January 18, 2021. Thus, NECEC did commence construction pursuant to a validly issued permit. However, the Presidential Permit was not final. Although it was permissible for NECEC to begin construction in reliance on the Permit, it did so at its own risk because the Permit was timely appealed. NECEC's rights to complete construction, insulated from any change in the law brought about by the Initiative, did not vest.

Of course, although the Presidential Permit was the last permit needed, it was not the only permit required. NECEC commenced construction while several of the permits required for the Project were subject to pending appeals by an administrative agency or court. For instance, the appeal of the DEP order to the DEP is still pending, and the DEP Commissioner recently suspended the DEP permits pending the outcome of this litigation. Similarly, the appeal of the ACE Permit is still pending at the First Circuit. The uncertain outcome regarding the fate of all these permits cuts against vesting.

There is also the question of the BPL Lease. In *Black v. Cutko,* the Business and Consumer Court reversed the grant of the BPL Lease, finding no competent evidence that BPL fulfilled its statutory and constitutional obligations before issuing the lease to NECEC. BCD-CV-2020-00009, 2021 WL 3700685, at *5 (Me. B.C.D. Aug. 10, 2021). The language of *Sahl*, which focuses on vested rights in the context of changes in zoning and other governmental ordinances, requires a validly issued

*permit.* 2000 ME 180, ¶ 12, 760 A.2d 266. The analysis, however, applies equally well to the BPL Lease. The BPL Lease is indisputably a critical element in the Project, and therefore functions equivalently to a permit. As it stands at the moment, the BPL Lease is considered void. Without the BPL Lease, the Project cannot be completed. Accordingly, NECEC's rights to complete the Project will not vest unless or until the BPL Lease is finally approved. There is no question that NECEC had the right to begin construction under all these circumstances and did so in good faith. But because NECEC began work on the Project before all necessary approvals were final, it did so at the risk that a change in the law would imperil completion of the Project, as Avangrid acknowledged in its 10-K reports.

Intervenor Maine State Chamber of Commerce argues that if NECEC or any developer must wait until all permits and approvals are final before rights will vest, then big, complicated, projects will never be undertaken or completed in Maine. The Chamber certainly has a well-founded concern, and the Court acknowledges that the permitting and approval process for the Project has been daunting. But whether the conclusion reached here will forestall other significant projects, is speculative.[26] Not

---

[26] To be clear about the conclusion on this point, the Court is not saying that final permits are always and everywhere needed to support a vested rights argument, but that in some circumstances they may be—because of the equitable nature of the vested rights inquiry. This case presents such circumstances, and the Court's analysis is (as it must be) tied to the facts of this case. Equity follows the law, as the Maine State Chamber of Commerce noted at oral argument, but it does not work in a vacuum. A developer's extensive knowledge about comprehensive efforts to change the law in a way that would adversely impact a project, as the Law Court has said, complicates the vested rights analysis. This does not mean, as Plaintiffs and supporting Intervenors protest, that permits are not worth the paper they are written on. Such a claim would misinterpret the result of this decision. It does mean that if at or around the start of substantial construction developers are aware of events rising to the existential level of "strategic risk factors," as were Plaintiffs in this case, they might not later be able to claim vested rights without final permits in hand.

all big, complicated projects may be met with the widespread public opposition attendant to this Project. Even here, NECEC may yet prevail and complete the corridor. And ultimately the Legislature can respond to any undue chilling effect by, among other steps, streamlining the approval process. On the facts of this case, however, two out of the three *Sahl* factors have not been satisfied, and NECEC's rights to complete the Project despite subsequent, retroactive changes in the law, did not vest.

## B. Separation of Powers

NECEC also argues that the Initiative violates the separation of powers principles enshrined in both the United States and Maine Constitutions. *See* U.S. Const. arts. I-III.; Me. Const. art. III §§ 1-2. Specifically, NECEC claims that the Initiative usurps both executive and judicial authority.

"The more that the 'independence of each department, within its constitutional limits, can be preserved, the nearer the democratic system of government will approach the perfection of civil government, and the security of civil liberty.'" *Avangrid*, 2020 ME 109, ¶ 24 (quoting *Lewis v. Webb,* 3 Me. 326, 329 (1825)). Maine law requires "strict separation of powers between the three branches of government." *Bossie v. State*, 488 A.2d 477, 480 (Me. 1985). Under Maine's Constitution, the separation of powers requirement is "more rigorous" than is its federal counterpart. *Id*. When determining whether a separation of powers violation has occurred, the court must ask: "Has the power in issue been explicitly granted to one branch and no other?" *Id*. If so, then another branch cannot exercise it. *Id*.

1) <u>The Initiative Does Not Usurp Executive Power.</u>

NECEC's first argument is that the Initiative's enactment would usurp the power of Maine's executive branch because it voids—or has the effect of voiding—final executive agency determinations and improperly authorizes the Legislature to cancel construction of a project already underway. Additionally, NECEC claims that the Initiative provides an end run around the Maine Constitution's presentment requirement by allowing the Legislature to approve a project of the kind contemplated by the Initiative without offering the Governor the opportunity to veto that approval.[27]

Power to execute law is vested in the Governor. Me. Const. art. V, pt. 1, § 1; *In re Opinion of the Justices of the Supreme Judicial Court Given Under the Provisions of Section 3 of Article VI of the Constitution* (*"Opinion of the Justices"*), 2015 ME 27, ¶ 5, 112 A.3d 926. In her role as the supreme executive, the Governor is required to "take care that the laws be faithfully executed." Me. Const. art. V, pt. 1, § 12; *Opinion of the Justices*, 2015 ME 27 at ¶ 5, 112 A.3d 926. The executive branch of Maine's government consists of the Governor's office as well as executive agencies, including BPL and PUC. *See Opinion of the Justices*, 2015 ME 27 at ¶ 5, 112 A.3d 926.

In a prior, related decision on the validity of the 2020 initiative, the Law Court held that legislation cannot direct an executive agency to reverse a particular final decision as this would unconstitutionally interfere with the agency's executive

---

[27] As to this last argument, the Initiative requires only that certain linear projects obtain the requisite approval of the Legislature. Nothing prohibits the Legislature from then presenting the approval to the Governor for a signature or veto.

functions. *Avangrid*, 2020 ME 109, ¶¶ 35-36, 237 A.3d 882. NECEC urges the Court to find that the Initiative draws from the same poisoned well. It argues that the Initiative, by retroactively requiring legislative approval of certain types of construction endeavors which include the Project, effectively reverses the PUC's grant of a CPCN, just as the 2020 initiative purported to do, and is unconstitutional on the same basis as the holding in *Avangrid*.

The flaw in NECEC's reasoning is that unlike the initiative addressed by *Avangrid*, the present Initiative does not reverse a particular final agency decision. NECEC objects to the Initiative as squarely targeting the Project and this Court cannot disagree that the Project was the impetus for and focus of the referendum. Throughout their campaign, supporters of the Initiative consistently emphasized that voting for it would block the Project corridor. The advertising in support of the Initiative was so targeted that a voter would be forgiven for not realizing the law would have any effect *other* than obstructing the Project.

But campaign advertising is not the issue. Rather, this Court must look to the language of the Initiative's proposed law. It is axiomatic that statutory interpretation is fundamentally based on a reading of the statute itself. *See Stone v. Bd. of Registration in Med.*, 503 A.2d 222, 224 n.4 (Me. 1986) (exhorting interpreting court to "read the statute!"). There is nothing in the plain language of the Initiative that suggests it is anything other than a statute of general applicability affecting various linear projects and regulating high-impact electric transmission lines in Maine.[28] It

---

[28] Indeed, LD 1295 does not appear to be different in kind from the original implementing legislation, 12 M.R.S. § 598 & 589-A.

does not reverse any specific agency decision but rather places new, retroactive requirements on a category of decisions. This is supplementation of existing law, not usurpation of executive power.

It is both legal and logical that a new law may be directly motivated by a given entity or activity and enacted with the intent of imposing requirements or restrictions on that entity or activity; so long as the law itself is one of general applicability, it will not be invalidated for including its target in its effect. *See Friends of Cong. Square Park v. City of Portland*, 2014 ME 63, ¶ 15, 91 A.3d 601 (holding it is within scope of citizens' initiative power to block sale of city park via legislation creating new category of land bank property, retroactively including park in question, and placing new requirements on the disposition of property in the land bank). Motivated by NECEC's Project, the people of Maine have expressed their strong desire to safeguard public lands from linear construction projects. It would be unjust to refuse, as a matter of course, to apply the new law to the perceived threat which inspired it.

2) The Initiative Does Not Usurp Judicial Power.

The judicial power of this State is vested in the Supreme Judicial Court and such other courts as the Legislature establishes. Me. Const. art. 4, § 1. A final judgment by the judiciary in a case is "a decisive declaration of the rights between the parties, and the Legislature cannot disturb the decision . . . as to the parties in that action." *L.V.I. Group*, 1997 ME 25, ¶ 11 n.4, 690 A.2d 960. NECEC argues that the Initiative reverses a final judgment by requiring the PUC to vacate a CPCN already affirmed by the Law Court in *NextEra,* allowing the Legislature to veto the

Project attached to that CPCN, and thereby vacating the holding of *NextEra. See NextEra*, 2020 ME 34, ¶ 43, 227 A.3d 1117. But *NextEra* only addressed the specific issue of whether the PUC erred procedurally or factually in issuing the CPCN, finding that it had not. *Id.* The mere fact that a law impacts a court decision does not equate to an exercise of judicial power. *See MacImage of Maine, LLC v. Androscoggin Cty.*, 2012 ME 44, ¶ 27, 40 A.3d 975. Where a piece of legislation has wide effect and is an expression of public policy, it does not usurp the court's adjudicatory function. *Id.* ¶ 29.

For broadly the same rationale as explained above in relation to the executive power, the Initiative is not an unconstitutional usurpation of judicial power. It is rooted in a policy determination by the people of Maine that the disposition or lease of public lands requires heightened scrutiny by the Legislature. It does not reverse or vacate a specific judicial decision but rather imposes additional requirements for a category of linear projects, including the one for which the PUC issued the CPCN at issue in *NextEra.* The Law Court's holding in *NextEra* stands. For all of these reasons, the Initiative does not violate separation of powers principles.

The Court also briefly addresses Intervenor HQUS' arguments that the Initiative usurps the judiciary's constitutional interpretive authority. Specifically, HQUS posits that the Initiative's attempt to define the constitutional phrase "uses substantially altered" found in article IX, section 23, as being inclusive of "high impact transmission lines, poles, landing strips, pipelines and railroad tracks" usurps the constitutional interpretive powers reserved for the judiciary. In support, HQUS

cites *Wagner v. Sec'y of State*, 663 A.2d 564, 567 (Me. 1995), which purports to identify two instances when an initiative exceeds the power the people granted to themselves: when it usurps (1) the enacting powers of the Legislature; or (2) the interpretive powers of the judiciary.

The Court is unconvinced that the Initiative does the latter. The statute at issue in *Wagner* was much more restrictive than the Initiative here and attempted to define and limit the number of constitutionally protected classes who are entitled to equal protection under Maine laws. *Id.* at 566 n.3. Despite this attempt to define constitutionally protected classes in full, the Law Court still allowed it on the ballot— holding that such an exercise did not present the Court with "subject matter beyond the electorate's grant of authority." *Id.* at 567.

In contrast, the Initiative here attempts to do even less than the initiative in *Wagner* and, in the Court's mind, is inclusive. The Initiative merely specifies structures included within article IX, section 23's phrasing and does not foreclose the inclusion of others. Thus, the Court is unpersuaded by HQUS' argument that the Initiative usurps the judiciary's interpretive authority.

## C. Contracts Clause

The U.S. and Maine Constitutions both prohibit the impairment of contracts. U.S. Const. art. I, § 10; Me. Const. art. I, § 11. NECEC argues that the Initiative unconstitutionally impairs a valid contract for the lease of a 0.9-mile stretch of land through the West Forks Plantation and Johnson Mountain Township, executed first in 2014 and amended and restated in 2020. Specifically, NECEC contends that the

Initiative's empowerment of the Legislature to effectively cancel the BPL lease—should the Legislature not approve it by a 2/3 majority—is an unconstitutional impairment.

To determine whether the application of a statute results in an unconstitutional impairment of a contract, Maine courts utilize a three-part test. *American Republic Ins. Co. v. Superintendent of Ins.*, 647 A.2d 1195, 1197 (Me. 1995) (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)). The threshold question is whether the law "operates as a substantial impairment of a contractual relationship." *Id.* If so, the State must have "a significant and legitimate public purpose" for the regulation, such as remedying a broad, general social problem. *Id.* (citing *Energy Reserves Group*, 459 U.S. at 411-412). In addition, the adjustment of the contracting parties' rights and responsibilities that results from the new law must be based on reasonable conditions and "of a character appropriate" to the purpose that justified its adoption. *Id.* (citing *Energy Reserves Group*, 459 U.S. at 412).

As noted earlier, in August 2021, this Court determined that BPL entered into the 2020 Lease without authority, and thus the Lease is void. The Law Court has taken the issue up on appeal and if it affirms the Court's holding, there will have been no valid lease to impair. Conversely, should the Law Court determine that the lease is valid, NECEC's Contracts Clause argument is still hampered by the language of the BPL Lease, which explicitly provides that NECEC "shall be in compliance with all Federal, State, and local statutes, ordinances, rules, and regulations, *now or*

41

*hereinafter enacted* which may be applicable to [NECEC] in connection to its use of [the leased public lands]" (emphasis added). The newly enacted Initiative, which creates additional requirements for construction such as the Project, likely cannot impair a contract which anticipates such legislation.

The foreseeability of new regulations at the time of contracting also impacts whether a law can be said to impair a contract. *All. of Auto. Mfrs. v. Gwadosky*, 304 F. Supp. 2d 104, 115 (D. Me. 2004) (holding that regulation which parties should have foreseen did not impair contract). Not only is land use heavily regulated at the state and local level such that new regulations are generally foreseeable, *Kittery Retail Ventures*, 2004 ME 65, ¶ 39, 856 A.2d 1183, but NECEC entered the purported BPL Lease amid intense public scrutiny, legal challenges, and a popular ballot initiative to block the Project. As of June 23, 2020, the date that the amended and restated 2020 BPL Lease was executed, NECEC was on notice of efforts to stop construction on the public lands by subjecting the lease to new requirements, and should have foreseen the potential success of an initiative.

Even where legislation does substantially impair a contract, such impairment is permissible if it serves a significant and legitimate public purpose. *See American Republic Ins. Co.*, 647 A.2d at 1197. Courts are reluctant to defer to legislative judgments of whether the purpose is legitimate and the impairment reasonable and necessary when the State itself is a party to the contract "because the State's self-interest is at stake." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26 (1977); *see Kittery Retail Ventures, LLC*, 2004 ME 65, ¶ 38, 856 A.2d 1183. This self-interest is

42

not implicated where, as here, the impairment does not actually accrue financial benefit to the State. *See Seven Up Pete Venture v. Montana*, 114 P.3d 1009, 1023 (Mont. 2005) (holding heightened Contract Clause scrutiny inapplicable where voter initiative "caused the State to forego the opportunity to receive royalty payments," meaning its interests as party to contract "were actually diminished" by passage of initiative). NECEC argues that the State of Maine will allegedly benefit from the completion of the Project via lowered electricity costs, reduced greenhouse gas emissions, job creation, and hundreds of millions of dollars of value in rate relief, economic development, education, and property taxes. It cannot also argue that the State's self-interest is implicated by a law which will block the Project.

The Initiative, as a public referendum, represents a democratic expression of the public's determination that the additional regulations are in the public interest and this determination is worthy of the Court's deference. The citizens of Maine believe that it is in the interest of the State to restrict high-impact transmission lines in the Upper Kennebec Region, to provide additional protections to public lands in the context of certain linear construction projects, and to require stricter scrutiny of certain transmission line projects. Requiring two-thirds legislative approval of defined types of construction projects, paralleling Maine's constitutional condition for substantial alterations of public land, is an appropriate and reasonable method of enforcing this public interest. *See American Republic Ins. Co.*, 647 A.2d at 1197; Me. Const. art. IX, § 23.

**II. Irreparable Injury**

The second factor in the Court's preliminary injunction analysis is whether this Court's failure to grant the requested injunction would result in irreparable injury to the movant. NECEC rests their assertions of irreparable harm on two distinct allegations. First, that a prospective constitutional violation constitutes *per se* irreparable injury, and second, that the failure to grant an injunction will result in further delay of the NECEC project, resulting in significant economic harm and potentially threatening the Project's completion.

"[P]roof of irreparable injury is a prerequisite to the granting of injunctive relief." *Bar Harbor Banking & Trust Co. v. Alexander*, 411 A.2d 74, 79 (Me. 1980). Irreparable injury is defined as "injury for which there is no adequate remedy at law." *Stanley v. Town of Greene*, 2015 ME 69, ¶ 13, 117 A.3d 600.

## A.    Constitutional Violation as *per se* Irreparable Harm

The Court first addresses NECEC's contention that it will suffer irreparable harm because of the alleged threat of various constitutional violations. In support of this contention, NECEC cites case law from other jurisdictions which finds irreparable injury when a constitutional violation has been alleged. *See Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009); *Condon v. Andino, Inc.*, 961 F. Supp. 323 (D. Me. 1997). As discussed below, however, all of those cases are distinguishable from the facts presented here.

In *Gordon*, the D.C. Circuit Court of Appeals held that the plaintiff had made a sufficient showing of irreparable injury when he established a prospective violation

44

of a constitutional right. *Gordon*, 721 F.3d 638 at 653. In that case, the challenged law threatened the plaintiff's right to due process because it forced him to pay what he alleged were unconstitutional taxes, or risk incurring civil and criminal penalties. *Id*. The *Gordon* court reasoned that the alleged constitutional violation, combined with the threat of criminal and civil liability, was enough to warrant a finding of irreparable harm. *Id.*

In *Am. Trucking Ass'ns*, the 9th Circuit similarly held that a prospective violation of constitutional rights may constitute irreparable injury. *Am. Trucking Ass'ns*, 559 F.3d at 1057. In a similar set of facts to those the *Gordon* court had before it, the *Am. Trucking Ass'ns* court relied not just on the threatened constitutional violation to come to this conclusion, but also on the imminent threat of civil or criminal liability that the party seeking an injunction faced. *Id.*

The District Court for the District of Maine's decision in *Condon* is no different than the aforementioned. While it is true that the *Condon* court recognized the jurisprudential practice of finding irreparable injury where a constitutional violation is alleged, it only found the existence of irreparable injury because the "Plaintiff [was] faced with the decision of either complying with regulations that are unconstitutional or violating his Town's laws . . . risk[ing] fines or other penalties." *Condon*, 961 F. Supp. at 331.

The Defendants rebuff NECEC's assertion of *per se* irreparable injury where a constitutional violation is threatened by citing their own set of cases from other jurisdictions that limit application of Plaintiffs' *per se* rule to certain specific areas of

constitutional jurisprudence. *See Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The only area[s] of constitutional jurisprudence where . . . a . . . [constitutional] violation constitutes irreparable injury [are] the area[s] of first amendment and right of privacy jurisprudence."); *Pub. Serv. Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (holding that cases equating a threatened deprivation of a constitutional right with irreparable injury are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy or other rights as to which "temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief").

Plaintiffs' argument fails under either line of cases. This Court has not found any constitutional violations, threatened or otherwise. Further, although Plaintiffs raise several ways in which the Initiative may offend certain constitutional principles, none of the threatened offenses are accompanied by imminent civil or criminal penalties like in *Gordon*, *Am. Trucking Ass'ns*, and *Condon*, nor are the alleged violations of the type that other courts have found sufficient to make a showing of irreparable injury. Although NECEC notes that various executive agencies may seek to enforce the Initiative's provisions, the language of the legislation itself does not suggest any imminent civil action will be brought against them. Accordingly, Plaintiffs' alleged constitutional violations do not constitute irreparable injury *per se*.

**B. Economic Harm and Project Delay**

The Court next addresses NECEC's contention that this Court's failure to enter an injunction would significantly delay the Project's timeline and potentially threaten its completion.

Economic harm is generally not considered sufficient to constitute irreparable injury, and any alleged injury must be more than merely speculative. *OfficeMax Inc. v. Qwick Print, Inc.*, 709 F. Supp. 2d 100, 113 (D. Me. 2010). Speculative injury "does not constitute a showing of irreparable harm." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop.* 839 F. Supp. 68, 74 (D. Me. 1993).

In the instant case, the harm NECEC reports it will suffer from an adverse decision is almost entirely economic in nature and speculative. NECEC asserts that, should the Initiative take effect on its designated date, each day that this proceeding progresses corresponds to one day of delay in construction. This delay, the Plaintiffs assert, would "threaten the cancellation of the Project altogether." The specter of undue delay, however, is unsupported by the record, and speculative.

NECEC's own Motion illustrates the speculative nature of such predictions by asking the Court to "assume" a two-year delay in construction for the purposes of demonstrating possible harm. But such an assumption is unreasonable based on the evidence. The State courts that have considered the various legal challenges and obstacles to the Project have acted with alacrity, frequently holding hearings and issuing decisions on a greatly expedited basis. Here, the Court is issuing a decision on Plaintiffs' Motion a mere six weeks after Plaintiffs initiated their action, and

several days before the Initiative is scheduled to take effect. The Court anticipates the Law Court will also move swiftly if presented with the case on appeal or by report.

Even in the unlikely event the litigation moves at the pace forecast by Plaintiffs, and begins to bump up against or threaten the contractual deadline of August 23rd, 2025, Plaintiffs do not adequately explain why they cannot amend the current agreement or negotiate a new contractual deadline for Project completion. NECEC itself has noted that such delays in transmission line projects are "common, if not inevitable." The land beneath the proposed corridor is not going anyplace.

While Plaintiffs stand to lose significant financial investment should they ultimately be unsuccessful, the Court is not convinced that a failure to enjoin the Initiative from taking effect in the short term will result in irreparable injury. The Plaintiffs have failed to establish any *per se*, non-speculative, and non-economic harm that will result from denying them an injunction while this litigation is pending.

## III. Balancing of Harms

The third prong of a Court's review of a request for injunctive relief is a balancing of the harms that either party will face from an adverse result. Put simply, this Court must determine who will suffer more harm: NECEC if an injunction is not entered, or Defendants if NECEC's request is granted.[29]

The moving party bears the burden of establishing that its alleged irreparable harm outweighs any harm the granting of an injunction would cause to other parties.

---

[29] Here, since Defendants consist of public agencies and legislative bodies, the Court considers harm to the public as synonymous with harm to Defendants. *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009).

*Alliance for Retired Americans*, 2020 ME 123, ¶ 11, 240 A.3d 45. At the outset of this analysis, the Court notes that Plaintiffs' potential success is weakened by the Court's conclusion that they will not suffer irreparable injury. *See, e.g.*, *Pie v. Cotton St. Dev.*, No. CV-07-198, 2007 Me. Super. LEXIS 115 at *6, (Me. Super. Ct. June 12, 2007) (holding that because the movant had failed to establish irreparable injury, they also failed to establish that "any harm [the plaintiff] might suffer . . . outweighs the impact that the injunction would have on [the defendant]").

In their Motion, the Plaintiffs allege that the "likely cancellation of a billion dollar project"—the apparent result of a failure to enter an injunction—outweighs the harm that would be caused to the Defendants by withholding enactment of the Initiative. They also detail the negative climate impact of failing to grant an injunction, alleging that not doing so would worsen an already grave climate crisis. Intervenors supporting the Project raise similar allegations and detail the particularized harm they—and the stakeholder groups they represent—would incur.[30]

In response, Defendants raise their own arguments focused primarily on the direct environmental impact that continued construction will have on the land the Project runs through. They also raise concerns about the deprivation of Project

---

[30] Intervenor Industrial Energy Consumer Group alleges that enactment of the Initiative will upset the public's confidence in Maine's utility regulatory paradigm and will hinder the effort to fight climate change. Intervenor Maine State Chamber of Commerce claims that if the Initiative takes effect, it will discourage future investment in similar permit heavy projects. Intervenor International Brotherhood of Electrical Workers asserts that the Initiative will end employment for some of its members and stymie future employment because investors will avoid funding projects like the NECEC. Intervenor Cianbro makes several supporting arguments and also claims that the Corridor will have a direct impact on their construction business and their involvement in future projects like NECEC.

benefits to the Maine people should an injunction be entered, construction completed, and the Initiative found constitutional. In this scenario, the Defendants assert that what would result is a constructed, non-operational corridor without the corresponding bargained-for benefits aimed at enhancing the energy consumption experience for Mainers.

The Court appreciates the impassioned advocacy of all parties involved but, in this case, finds that the harm from issuing a preliminary injunction would outweigh the harm of denying NECEC's request. To understand this conclusion, context is important. To decide the Motion, this Court's charge is to balance the equities in the short term, not to balance them in the long term. The question now is not whether climate change or direct construction poses a greater environmental threat; nor is the question what impact the Initiative will have on future economic investment in Maine. The question is whether, during the likely short lived litigation period, the harm from entering or refusing to enter a preliminary injunction will be worse.

With the relevant time frame in mind, the Court notes that the preliminary injunction factors are not considered in isolation from each other. The Court has already determined that Plaintiffs have not demonstrated a substantial possibility of prevailing on the merits, and that Plaintiffs will not suffer irreparable injury (in the short term). The Court further finds that if Plaintiffs are allowed to complete construction of the Project while the litigation is pending—and then lose—the existence of a completed, non-operational corridor would inflict at least some harm on the environment. Under all of these circumstances, without the State's highest

court first having a chance to weigh in, the blow that granting an injunction would deal to the public's confidence in Maine's direct initiative process and the institution of participatory democracy further tips the scales. Accordingly, the balance of the harm falls in favor of Defendants.

## IV. Public Interest

The fourth and final consideration in the Court's preliminary injunction analysis is the effect granting the injunction will have on the public interest. The public interest factor asks this Court to "inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005) (citing *United States v. Zenon*, 711 F.2d 476 (1st Cir. 1983)). Here the answer is resoundingly affirmative.

The broad purpose of Maine's direct initiative process is to encourage the people's engagement in participatory democracy. *Allen v. Quinn*, 459 A.2d 1088, 1102 (Me. 1983). The process, governed by article IV, section 18 of Maine's Constitution, became effective on January 6th, 1909, and represented a "fundamental change in the existing form of government in so far as legislative power was involved." *Farris ex rel. Dorsky*, 143 Me. 227, 230, 60 A.2d 908 (1948). Previously, the power to legislate had been vested only in the House of Representatives and the Senate, but by the thirty-first amendment to Maine's Constitution, the "sovereign which is the People [took] back . . . a power which the people vested in the Legislature when Maine

51

became a State." *Id.* at 231. "The significance of this change must not be overlooked." *Id.*

In the instant case, the Plaintiffs' request for an injunction asks this Court to block the enactment of a ballot initiative dutifully presented to the 130th legislature and voted through by the Maine electorate after the Legislature's failure to act. Thus, in the Court's view, the people of Maine have declared their interest in this litigation. The public's directive, as announced by 59% of Maine voters, is clear: enact LD 1295, i.e., the Initiative, by way of ballot question one. A decision to issue an injunction foreclosing the Initiative's enactment would directly affect this public interest. Accordingly, an analysis of the fourth preliminary injunctive factor again supports a denial of NECEC's request.

## CONCLUSION

For the reasons set forth herein, the Court concludes that Plaintiffs have not satisfied their burden to demonstrate that all four criteria necessary for a preliminary injunction have been satisfied. To the contrary, the Court concludes Plaintiffs have not shown any of the criteria to be met. Consequently, Plaintiffs have not established their entitlement to a preliminary injunction. Plaintiffs' Motion for Preliminary Injunction is denied.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case. So Ordered.

Dated:__**12/16/2021**____          _____

Michael A. Duddy
Judge, Business & Consumer Court

52

Entered on the docket: 12/16/2021

# EXHIBIT D

## TO

## PLAINTIFFS' VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF



Be it enacted by the People of the State of Maine as follows:

**Sec. 1. 12 MRSA §1852, sub-§4,** as enacted by PL 1997, c. 678, §13 and amended by PL 2013, c. 405, Pt. A, §24, is further amended to read:

**4. Lease of public reserved land for utilities and rights-of-way.** The bureau may lease the right, for a term not exceeding 25 years, to:

A. Set and maintain or use poles, electric power transmission and telecommunication transmission lines and facilities, roads, bridges and landing strips;

B. Lay and maintain or use pipelines and railroad tracks; and

C. Establish and maintain or use other rights-of-way.

Any such poles, transmission lines and facilities, landing strips, pipelines and railroad tracks under this subsection are deemed to substantially alter the uses of the land within the meaning of the Constitution of Maine, Article IX, Section 23, and a lease or conveyance for the purpose of constructing and operating such poles, transmission lines and facilities, landing strips, pipelines and railroad tracks under this subsection may not be granted without first obtaining the vote of 2/3 of all the members elected to each House of the Legislature.

Notwithstanding Title 1, section 302 or any other provision of law to the contrary, this subsection applies retroactively to September 16, 2014.

**Sec. 2. 35-A MRSA §3131, sub-§4-A,** as enacted by PL 2009, c. 655, Pt. A, §3, is amended to read:

**4-A. High-impact electric transmission line.** "High-impact electric transmission line" means a transmission line greater than 50 miles in length ~~that is not located in a statutory corridor, as defined in section 122, subsection 1, paragraph F-4, or a petitioned corridor, as defined in section 122, subsection 1, paragraph D-1, and~~ that is:

A. Constructed to transmit direct current electricity; or

B. Capable of operating at 345 kilovolts or more and:

(1) Is not a generator interconnection transmission facility as defined in section 3132, subsection 1-B; and

(2) Is not constructed primarily to provide electric reliability, as determined by the commission.

**Sec. 3. 35-A MRSA §3132, sub-§6-A,** as enacted by PL 2009, c. 655, Pt. A, §5, is amended to read:

**6-A. High-impact electric transmission line; certificate of public convenience and necessity.** The commission shall evaluate and render a decision on any petition for a certificate of public convenience and necessity for a high-impact transmission line ~~in accordance with section 122, subsection 1-D~~.

**Sec. 4. 35-A MRSA §3132, sub-§6-C** is enacted to read:

**6-C. High-impact electric transmission line; legislative approval.** In addition to obtaining a certificate of public convenience and necessity, a high-impact electric transmission line may not be constructed anywhere in the State without first obtaining the

approval of the Legislature, except that any high-impact electric transmission line crossing or utilizing public lands designated by the Legislature pursuant to Title 12, section 598-A is deemed to substantially alter the land and must be approved by the vote of 2/3 of all the members elected to each House of the Legislature.

**Sec. 5. 35-A MRSA §3132, sub-§6-D is enacted to read:**

**6-D. High-impact electric transmission line; geographic prohibition.** Notwithstanding subsection 6-C, a high-impact electric transmission line may not be constructed in the Upper Kennebec Region. For the purpose of this subsection, "Upper Kennebec Region" means the approximately 43,300 acres of land located between the Town of Bingham and Wyman Lake, north along the Old Canada Road, Route 201, to the Canadian border, and eastward from the Town of Jackman to encompass Long Pond and westward to the Canadian border, in Somerset County and Franklin County.

**Sec. 6. 35-A MRSA §3132, sub-§6-E is enacted to read:**

**6-E. Retroactivity.** Notwithstanding Title 1, section 302 or any other provision of law to the contrary, subsections 6-C and 6-D apply retroactively to September 16, 2020 and apply to any high-impact electric transmission line the construction of which had not commenced as of that date.

## SUMMARY

This initiated bill requires the approval of the Legislature for the construction of high-impact electric transmission lines and provides that high-impact electric transmission lines crossing or utilizing public lands must be approved by 2/3 of all the members elected to each House of the Legislature. This initiated bill also prohibits the construction of high-impact electric transmission lines in the Upper Kennebec Region. These provisions apply retroactively to September 16, 2020, the date of filing of this initiative.

This initiated bill also requires the approval of 2/3 of all the members elected to each House of the Legislature for any use of public lands for transmission lines and facilities and certain other projects. This provision applies retroactively to September 16, 2014.